Rehabilitation, LLC Rehabilitation, LLC We're ready to hear from the appellant. I take it you've broken up your argument, Mr. Howe. You're going to take 7 minutes, and the Department of Justice will take 5 of the opening remarks? Yes, your Honor. Let me make a comment to you at the outset, a prefatory comment. This Court is reluctant to consider ex parte the agreement which you submitted in response to our order to do that. And so if you want us to consider that, it seems to us that you ought to share it with them under some confidential arrangement. Are you prepared to do that? I think if the Court were to say that the agreement would be material to its resolution of the motion to dismiss. Well, we leave it to you to decide whether you want us to consider it. I'm simply saying, if you do, we think in fairness they ought to be able to review it, albeit under some confidentiality arrangement, which wouldn't be very hard. Would the Court permit me to take that question under advisement? Because I think I would want to consult with the counterparty to that agreement. The answer is yes. Thank you, your Honor. Judge Marcuson, may it please the Court. My name is Derek Ho, and I represent the relator Angela Ruck. Two key inaccuracies in the District Court's recitation of the trial record warrant reversal of the decision to set aside the jury's verdict after a month-long trial. One, the Court asserted that the government kept paying the defendants despite knowing about their fraudulent practices. But there was no evidence that the government knew about defendants' Medicare upcoding and ramping, and it is undisputed that the Medicaid surveys that defendants rely on focused solely on quality of care, not on billing fraud. Two, the Court described the fraud as paperwork defects that didn't deprive the government of the benefit of its bargain. But substantial evidence showed that rug upcoding and ramping deceived the government into paying for more care than patients actually got. And that care plans... No, you... Excuse me. Yes. I think from those statements, you have omitted any reference to the care plans. Are you conceding that the description of the evidence in Judge Merriday's order as to the care plans was correct? No, Your Honor. You read my mind and anticipated what I was about to say, which is that there was also substantial evidence that the care plans were a critical part of what the government expected to receive for its Medicaid dollars. And let me just explain why that's so. Unlike under Medicare, where a provider gets more money for providing more services, under Medicaid, the provider gets a flat fee per day. And so the incentive on the part of the provider is to cut corners and provide less care and still receive that same flat fee. The way that Medicaid protects against this is to create a requirement that the care be provided pursuant to a comprehensive plan of care. And that way, Medicaid has assurance that it is getting what it is bargaining for, namely that the care be provided pursuant to a plan, the plan reflecting the actual needs of the patient. And there was substantial evidence about the importance of these care plans at trial. There was also, frankly, direct evidence that the failure to create care plans would cause the government to refuse reimbursement. It would be helpful for me if we broke out Medicare from Medicaid. Yes, Your Honor. It might be that the flow of the argument might be easier and we might be able to digest it rather more effectively piece by piece. As for the Medicare, as I understand the guts of the fraud, you claim, one, that they were involved systematically in what you characterize as being up-coding, which had two aspects to it. One, submitting bills to Medicare with elevated rugs, that is a greater number of therapy minutes declared than were actually provided. And there was another piece of that as well. And then with respect to the other portion of your claim, it was rampant in connection with this matter as well. The facilities provided more therapy for patients than they actually needed or actually received. Correct, Your Honor. Right. Now, the district judge threw out the Medicare verdict, which is a huge verdict in this case, basically on two grounds. One, materiality, and two, see enter. Those were the arguments, as I understand it. Right? That was the basis for dumping the Medicare claim. Yes, Your Honor. Tell me where the sufficient evidence was both as to materiality and as to the sufficient mens rea with regard to the Medicare itself fraud. If I may first note, as we set out in our brief, that neither of those issues was actually trial under Rule 50A, you will not find an argument about materiality with respect to Medicare or knowledge with respect to Medicare. And the reason is that throughout the entire trial, it was recognized by both sides, both in terms of counsel's arguments and witness testimony, that the materiality with respect to Medicare was quite obvious. With respect, so now in answer to Your Honor's question, the evidence of materiality with respect to Medicare is, it's inherent in the way that the entire Medicare reimbursement system works. If you report, say, RUX as your RUG score, you are representing to Medicare that you provided the U, the middle letter, 720, at least 720 minutes of therapy. If, in fact, you only provided 500 minutes of therapy, you should have reported a different score. And had you reported that score, you would have been paid less. So the entire scheme is oriented around these reports, these representations that the provider is obligated to make truthfully about how much it's actually provided. And so if you upcode, you, in the words of defendant's own witness, Lee Giuliano, would definitely influence payments. That's at appendix page 693. Defendant's own experts, Palega and Dressel, also acknowledged that if you upcode, you are causing the government to pay you more than you otherwise should. That's at our blue brief at pages 12 and 13. It's really in the regulations itself, 42 CFR 413.335 to 337 and 343 basically say that the amount that you get depends on what score you report. The same is true of ramping. What ramping is essentially is a kind of slightly more sophisticated form of upcoding. You're actually providing, to use my example, 500 minutes of therapy. And then the minute you know that the government is actually watching you in this assessment period, you artificially inflate it to 720 to make it look like that's the amount of therapy that you're providing the entire time. That, too, obviously causes the government to pay more because it's left with the impression that you're providing 720 minutes the entire time when in fact you're only providing 500. And that's why CMS guidance, as we point out in our reply brief at 16 and 17, states very clearly that ramping is an abusive practice. Defendant's own chief compliance officer, Griffin, acknowledged that ramping is, quote, at our reply brief at page 17. So, again, the reason this argument wasn't preserved in the first place is it was uncontroversial that materiality, that the Medicare fraud was material. It was also uncontroversial that the defendants knew that because the whole point of the fraud was to make more money. The fraud here was that Levee Management, which superintended the billing practices of all the facilities, imposed what they euphemistically called rug budgets, which were really quotas, on the facilities and said, you must have 60% RUX, the highest rug score, irrespective of and knowing nothing about what the patient's needs were. I'm confused about why the argument wasn't properly preserved. As I understand it, in their renewed motion for judgment as a matter of law, the appellee advanced three arguments for setting aside the verdict. The first was that the relator had failed to establish the materiality of any Medicare or Medicaid violations. Isn't that so? Didn't they argue that in the district court? In their 50B motion, Your Honor, yes, but the reason it's not preserved is that a 50B motion can only renew a motion that was made prior to the verdict under Rule 50A. And they never made it originally. But they never made the materiality argument with respect to Medicare or the knowledge argument with respect to Medicare originally, Your Honor. Yes.  I see that my— That's all right. It's a complicated case, and we'll go over the limit. With regard to the Medicaid fraud, the evidence, it seemed to me, that was introduced was far more limited than as to the Medicare. And as I understand it, the thrust there was that the appellees failed to maintain a comprehensive care plan on file for each Medicaid resident. Was that the beginning, middle, and the end of the Medicaid, or was there more than that? That they failed to create and also to maintain— The comprehensive, right, to create and maintain a comprehensive care plan on file for each resident. Correct, Your Honor. Where's the fraud in that? Help me with that one. Sure, Your Honor. The fraud is that the comprehensive plan of care is part of what Medicaid bargains for under this per diem or fixed fee arrangement that I was alluding to before. That Medicaid needs to know that the providers have actually planned out the care that's needed for each patient so that they can't cut corners in the way that I was saying that they have the incentive to. And so it's in both the federal and Florida Medicaid rules and regulations that this care plan is an express condition of payment. If you don't have it, you can't get paid. And it's not just, you know, contrary to my friend's arguments, the fact that it's in the law books. There was also testimony at trial from people who know the practices in this area that, and I'm going to quote our expert, if the state discovers a violation of the care plan provision, it will automatically deny payment. Defendant's own expert, who was a former CMS official in charge of surveys, Stephen Pelovit, said care plans, quote, do need to be in place for payment. Cheryl McNally, who was a regional reimbursement supervisor for Levee Management, the may sway claims in a negative direction. And that was in the context of the defendants trying, scrambling when auditors came or surveyors came to backdate documents, to create care plans where none had existed, all in recognition of the fact that this is a fundamental part of what Medicaid bargains for when it agrees to pay billions and billions of dollars every year for care of these poor patients. I think we've got that. I think we've got it. Thank you. Thank you, Your Honor. Unless you want to eat into your rebuttal. No, thank you, Your Honor. I'll retain my time. Thank you, and we'll be happy to hear from the Justice Department. Thank you, Your Honor. Benjamin Schultz on behalf of the United States. The United States has participated as amicus in this case because, among other issues with the district court's opinion, the district court fundamentally misunderstood the legal test for materiality. As the Supreme Court explained in Escobar, the relevant question in looking at materiality is just the common law test and the statutory definition. And that test looks at whether or not the information was important in determining the government's decision making with regard to the transaction in question. The transaction in question is the important part there. Because in a case where the allegation or the proof is that a defendant has submitted false bills to Medicare, the transaction is Medicare's payment of the bill, not Medicare's decision 10, 15, 20 years down the road, whether or not it's going to pursue recoupment or some other enforcement action. It may be that Medicare's enforcement decisions 10, 20 years down the road could be relevant evidence. There may be circumstances where they have some probative value. But at the end of the day, their probative value has to go to what the government would have done at the time of payment. And once you understand that fundamental legal error, it's very, very clear that, as to the Medicare side of this case, that of course these things were material. If you take upcoding, when you tell Medicare that you provided 720 minutes of therapy to $600, when in fact you only provided 500 minutes of therapy and you're only entitled to $400, of course by reporting 720 minutes instead of 400 minutes, you cause the government to pay you out more money than you were entitled. And there's no real dispute about that. And in fact, that's not even an ESCOBAR issue, because it's not implied certification. It's just a lie. I think that's right. I think Your Honor has hit upon the point that ESCOBAR's entire discussion of materiality is about materiality when trying to determine whether or not something that's an implied certification is an implied statement about something that is material, as opposed to here where we just have a straight-up claim that says, I provided 720 minutes of therapy, or this person was RUX, when in reality they were RVX or some other code that got less money. And that's why, as to the Medicare side, frankly, we don't understand, or at least it's very except that this fraud was material. Now, as to the Medicaid side, it gets a little bit more complicated. But that's only because you can make an argument that the evidence was on multiple sides. But at the end of the day, this court is reviewing a jury verdict. And the question is not what this court as a fact finder would have concluded. The question was just applying the holistic test for materiality as set out in ESCOBAR. Is there sufficient evidence that a jury could have concluded that this was material? And we laid out in our brief a number of reasons why their evidence was there. And that included evidence, for example, that this was a condition of payment, which ESCOBAR says is relevant evidence. And additionally, it included evidence that this was important to Florida Medicaid for the reasons that the relator has identified in her argument, and for the reasons that the testimony set out, which is that if you don't have these care plans in place, then there is a real risk that a provider is going to under-provide care to the Medicaid population. And there was substantial evidence in this case that the entities were doing just that, that they were deliberately not providing care to Medicaid patients precisely because they were getting this flat fee. And maybe the defendants have arguments why, despite all of these problems, Florida Medicaid wouldn't have cared about this. And that's why it was a fact question for the jury. And it's inappropriate for a reviewing court to simply just reweigh the evidence. I'd be happy to talk about the causation issue as well, which is another issue that the United States has opined on. I don't think there's really any dispute here that the relevant test is proximate cause. And then once you get to proximate cause, we think the district court simply misapplied that test. The way to apply that test is to apply it the way the common law has always understood it. Here, as we've said on our brief, there are a number of reasons to think that the management entity proximately caused the submission of a number of false claims. Can we go back to the care plans? Sure. So, as judges, we know that people get prosecuted all the time for overcharging Medicare. And as many of us are relatives of doctors, we know that there is great fear in the Medicare, in the physician community and in the health care services community, of Medicare prosecution over overcharging. But what about the care plans? Is that something that has been the subject of prosecutions or not? So, Your Honor, I want to be clear. When we're talking about care plans, I think at least insofar as they're relevant to this case, I don't think they were later relied on care plans to establish Medicare fraud. I think we're talking about Medicaid. But that's at the heart of the Medicaid. Medicaid. Yes, I'm sorry. I apologize. Have there been prosecutions under the Medicaid laws for the failure to have a care plan? So, I don't know one way or another whether... So, I don't know whether there have been any federal enforcement actions. But here it's important to recognize that the relevant payor was actually the state agency. It was Florida. And so the relevant question was, was this something that Florida would have considered material? If the record is silent as to whether or not Florida engaged in prosecutions, then it's silent as to that particular issue. But here we think that there was sufficient evidence... What evidence is there in this record from which a jury could reasonably infer? Medicaid fraud flowing simply and solely from the failure to prepare a comprehensive care plan. So, why would it be material to Florida Medicaid? Yes. So, there were several pieces of evidence. The evidence would have to be sufficient to establish that. What is there that would have allowed a reasonable juror to conclude that the evidence was sufficient as to materiality regarding the failure to produce and prepare, or as they put it, to prepare and maintain the comprehensive care plans? Absolutely. And, Your Honor, I see my time is up. I'm happy to answer Your Honor's question. I think there were several pieces of evidence, and I'd be happy to go through them, keeping in mind that materiality is a holistic inquiry and no one factor is dispositive. And keeping that in mind, one piece of evidence, and this is a piece of evidence that Escobar itself said would be relevant, is whether or not the relevant payer would consider important, essential to the bargain. Here, the relator presented evidence that would permit that difference. That included the fact that HHS, the Office of Inspector General, has issued guidance on the importance of care plans. They've said that it's essential to policing fraud. There's also the common sense aspect of this, and common sense is also something that the Supreme Court in Escobar said you could look to. Why is the comprehensive care plan necessary, though, for that purpose? You asserted it in a high order of abstraction, as does the IG, but it doesn't jump off the page at me. Your Honor, the reason comes from the fixed fee. As opposed to saying we billed them for 700 minutes when, in truth and in fact, they only provided 350. Well, Your Honor, I think... It's obvious that's easy. And, Your Honor, I think there may be a reason why nobody is contending here that the care plans were essential to the Medicare scheme. I'm not asking about the Medicare scheme. And I think that's why... I'm only asking about Medicaid. And speaking for myself, I did not see how the failure to prepare and the failure to maintain comprehensive care plans was material to the fraud itself. Sure. And, again, I'd be happy to... It's that connection that didn't jump off the page at me. Your Honor, and I'd be happy to walk through all of the evidence. Let's start with why would this be essential, and why would the Office of Inspector General say that? And the answer comes from the fixed fee nature of the Medicaid payment scheme, where you're only giving someone a fixed fee, regardless of the amount of services that they provide to the patient. There is a very substantial risk, and indeed a risk that was borne out in this very case, that the provider is not going to meet all of the needs of the patient. What the care plan does is it forces the provider to document that need, so that, A, the provider has to recognize that need and hopefully meet it, but, two, that if the provider doesn't document that need and meet it, then when people go back and look at it, they can see that the provider has not met that need, and that provides an essential enforcement mechanism. And so it's at least reasonable for a jury to conclude, based on that, that the care plan was essential. But, Your Honor, if that's not jumping out at the page at you, and if you don't even think a reasonable jury could rely solely on that, there was other evidence in this case that included the testimony of a number of witnesses that Florida Medicaid would automatically deny payment if they learned that the care plans were not in place. It was also the evidence that Florida Medicaid treated this as a condition of payment. All of these pieces of relevant evidence were before the jury. Now, the defendants have their arguments. I'll also point out that I think when the defendants are telling you about the government making payment despite actual knowledge, they're saying that because they're not applying the correct legal test for materiality. How long a period of time did they fail to provide comprehensive plans? Your Honor, I don't know that we have direct evidence of continuing practices in this case. I think what you have in this case is evidence that within a period of time where the relator had evidence and presented that evidence at trial, there were some situations where there were no care plans. I would defer to my colleagues who litigated this case below as to whether I'm missing any evidence. But my understanding is after a certain point, the evidentiary record is just silent as to the presence or absence of care plans. Now, the defendants are saying, hey, some state surveyors came in. They found out in some isolated instances there weren't these care plans. But that does not mean, A, that Florida Medicaid failed to pay the past instances or would have, had they known at the time of payment that they wouldn't have paid. So in other words, if you put yourself in a situation where you submit your bill to Florida Medicaid, but at the time you submit your bill, you call them up and you say, hey, Florida Medicaid, I'm submitting this bill to you. But just so you know, I'm submitting a bill for someone who doesn't have a comprehensive care plan. And if the answer to that hypothetical is that Florida Medicaid will say, wait a second, you don't have a comprehensive care plan? I can't make that payment or I'm not going to make that payment or I got to think really seriously about whether or not I can make that payment. If that's Florida Medicaid's answer, then it's material. But isn't that, doesn't that go to Judge Ungaro's question? What enforcement actions have there been in this missing care plan arena? Because if the government truly cares that there are no care plans, that's certainly very easy to find out. So, Your Honor, we're not disputing that post-payment actions could be relevant evidence that a fact finder could weigh. Now, whether or not evidence... We're not even talking about post-payment. We're just talking about general knowledge in the healthcare community as to whether or not Medicaid comes after nursing home companies that don't have comprehensive care plans for the patients. So, I think there was evidence presented that surveyors found, surveyors who were not interested in billing, surveyors who were interested in patient safety, that when they found in some instances violations of care plans that they noted those violations. I'm not sure that the record says one way or another about the specific kind of enforcement actions that Florida Medicaid has taken. But even if the record is silent on that, that just means that there was one potential form of proof that we don't have information about. There are other potential forms of proof that we do have information about that was presented to the fact finder, and the fact finder was entitled to weigh that evidence. Thank you much. May it please the court. Good morning. I'm Greg Luce on behalf of the defendants below and the appellees here before you today. And thank you for your honor's careful reading of the record as we've seen. So, I'll go straight to the point. The relator tried a case that would have been effective prior to June of 2016. Let me ask you, do you want to begin with your motion to dismiss? Your honor, we have brought what we think... You need not, but it seems that you might begin because you claim that whatever else they did with ARAS, it denuded them of having standing in a constitutional sense. Although the argument seems to me to be more like you're saying what we used to call statutory standing and now look at in terms of does it state a claim? Your honor, I think you framed it. What if you're saying there is no constitutional standing here, that ab initio, and if you were right, would dispose of the whole case before we set down the road to examine anything else. We could not exercise power if the plaintiff, the qui tam plaintiff was denuded of standing here. That's correct. So, you may want to start with that. I will address it right away. I was a bit confused because I thought your honor wanted to Well, no, I think in fairness, you ought to be able to see it under some confidentiality agreement, but I don't know that it's necessary in any event. They assert with respect to that, that what they effectively did was gave 4% of their share of the ultimate recovery. There's no dispute about that. If that be the case, I'm at a loss to see why they are denuded of standing in a constitutional sense. Looks to me that they'd have injury in fact. They'd have traceability and redressability. What am I missing? It seems to me what your argument really is, is different from standing in a justiciability sense. What you're really saying is they ought not to be able to proceed as an appropriate qui tam plaintiff. If they've sold off a piece of the action or a piece of the recovery. That doesn't say they don't have standing. That says something else. That seems to me to be the heart of your argument, but I just want to be clear that I understand what it is you're saying on the front end. Thank you, your honor, and I appreciate the framing of the question. The False Claims Act under the Supreme Court's teaching in the Vermont agency says that a relator who would otherwise lack standing to bring a claim on behalf of the United States can secure that standing through the efficacy of the assignment. So that is a partial assignment to pursue the government's interests. It is the government that has standing. The relator only has standing to stand in the shoes of the government when the relator meets the requirements that's set by the statute. There are no authorizations and the limit of the assignment is clear that it would only be valid. Did they comply with the statute? They have not complied. They complied in the sense that they filed their application under seal. They had to wait 60 days. We had to see whether the government, in fact, was going to proceed or whether it wouldn't intervene. We got the answer to that. No other suit was filed based on the underlying facts as they were pled and filed. The relator did not rely on a previous public disclosure in bringing the case. Harris is not bringing a claim as a relator. They filed no complaint under seal or otherwise. What is it that they did not comply with in the statute other than saying the overall thrust of the statute must mean that they cannot partially assign a piece of their recovery, which I think is the heart of your argument? It is, Your Honor. Why can't they partially assign a piece of the recovery? They're not signing away the cause of action. They're not signing away the control of the cause of action. They're just, they claim, have given up potentially four percent of the recovery or maybe a little bit less than that, I think is how they phrase it. First, Your Honor, they have no authority to make the assignment. Lacking the authority to make the assignment, the rest of that simply determines what should be the remedy. But there is, it's beyond, I think, real challenge that nothing in the False Claims Act allows a relator. Is there anything in the False Claims Act that prohibits it? No, because that's not necessary. An assignment is limited by its terms and absent either an agreement by the party or an extension statute, the assignment cannot be abrogated or met, meted out to others. This is why it does pose potential constitutional concerns. We're not suggesting that it is a constitutional deficiency. But in the Vermont agency case, the court took special care to speak to the circumstances under which a relator could proceed on behalf of the government. When the relator exceeds that which has been given by the assignment, the relator is assigning a part of the government's claim. The relator has no right to the benefits or the winning of the case until a judge also agrees what that percentage should be. So, to assign an expectancy requires an assignment of the government's claim that the relator is now pursuing. So, to the standing, if the relator has now breached her agreement with the United States, and there's every evidence that she has because she has exceeded that which the assignment allows, the relator is no longer a qualified relator. And should that be allowed, it raises the very serious take care of laws. It's fascinating that one might have expected that argument to be made by the United States of America if they were concerned. We've heard not a word from the government saying they could not partially assign a piece of the recovery. The silence is deafening, Your Honor, because it creates a very big problem for them. They rely on relators to bring cases to them. But they do not seem to think it provides the problem that you do. They do not have the authority to allow a relator to farm out cases. Maybe not. But I just say it's interesting that they've said nothing. It's an interesting case, Your Honor. And I think it's important. I think this is a very important motion because it does test the bounds by which we can have essentially a shadow treasury funding claims against citizens of the United States employing a quasi-criminal statute, as this one has been described, for their own profit. They don't have to have suffered any individual harm. In fact, the whole point of standing here is simply standing in the shoes of the government. And therefore, the notion of a shadow treasury that could be used to commoditize claims— So, I agree with you that it's an important question. But when Congress designed the FCA and it put a variety of limitations there, it wanted, on the one hand, to encourage citizens with personal knowledge to come forward with respect to fraud committed against the government. And on the other hand, it wanted to balance that against what it might characterize as stifling parasitic lawsuits. So, they created their own balance. And they said a quitame suit can go forward with a relator if A, B, C, D, E, F, and G. But notably, they said nothing about H to it that they couldn't sell or assign a piece of the recovery. You want us to read that into the structure of the FCA, even though the FCA is silent on prohibiting it. And I'm simply asking you what there is in the FCA that would yield that result, given their silence on this precise issue. First, Your Honor, I believe that the assignment is limited by its terms. It cannot be unilaterally changed. So, the FCA didn't have to preclude all these things. The FCA creates, in the Supreme Court's Vermont agency reasoning, a limited partial assignment of the United States' interests sufficient to allow a relator to go forward. And without involving the Take Care Clause and the appropriate considerations by the United States of control of the case. It was also very clear that it is a limiting assignment because the court was quite concerned about abuses under private attorney general statutes and other circumstances that were argued in that case as suggesting a constitutional infirmity in the creation of a relator. So, the fabric of the assignment is you can do only that which the statute authorizes. You do not get to unilaterally decide because the statute prohibits it, it doesn't, it means that I can do it. Let me ask you just one final question. I don't want to really belabor it and let you get really to the heart of the issue. No, Your Honor, I think that's the heart of it. Your argument is that they can't proceed as a quitame relator whether they've disgorged 4% or all of it. It doesn't really matter what the amount is, so we don't really have to quarrel with the details of how much, right? Correct. Okay, I've got it. So, then the document itself becomes less important or maybe unimportant in the context of the argument. You would agree with that? I would agree that any assignment of however small a portion of the United States claim is... Gotcha. Because if indeed they had assigned away the totality of their recovery, then I'm not sure they would have constitutional standing. That is to say, I'm not sure that they could show any injury in fact that was concrete, but we don't have that problem. They've asserted in their briefs that have been filed with the court and that you've seen that they've effectively given away at most a little less than 4%, and that's not something you're quarreling with. No, Your Honor, what they've done... Okay. They've created a joint venture relator that didn't exist. I understand. I understand. Is it a joint venture relationship? Are you assuming that they've given away some level of control over the litigation? I don't know what control they've given. Partially, but I don't think it matters that much. Right. Your argument is it doesn't matter. They say, one, we've maintained complete control over the litigation. Two, we've maintained the expectancy interest in the overwhelming bulk of any recovery that we may get, but it is true that we bargained away for some consideration a little less than 4%. And you say accepting those facts is true. They cannot do that under the FCA, and while it's not a question of whether they have standing in a constitutional sense, they can no longer state a claim as an appropriately relator. That's your argument. Do I have it right? That is correct, Your Honor. I think it implicates standing, but yes, that is the argument, Your Honor. Okay. Why don't you go right to the issues that brought us here with respect to the determination by the district court. Judge, and let's break it down into Medicare on the one hand and Medicaid on the other. The district court basically dumped the case, claiming A, no materiality, and B, no scienter. That was the beginning, the middle, and the end of the reasons on Medicare. Your Honor, that is exactly what the court found, and the court recognized what the relator and the government choose not to, which is Escobar changed the requirements. I really am a little baffled by how you can take that position when Escobar deals with implied certification and the upcoding is, if it exists, a blatant misrepresentation. Your Honor, with respect to implied certification, Escobar established that implied certification can be a legitimate theory of liability under the false claim, and the first half of the opinion deals with that. But a unanimous court went on further to address materiality, and they did not address it only in terms of implied certification. In fact, it's very interesting, and I read it again this morning, anticipating your question, and it's a good one. The court goes, and further, we now will speak to materiality to establish a false claim. And the materiality they speak to includes express false claims in which there is an absolute misrepresentation of the fact. And the court even addresses the gun that wouldn't shoot as an example of the type of express false claim that should be considered under materiality. The last point I'll make on that is that they talk— Materiality is established, right? That's what they say. Yes, Your Honor. If you say you're producing guns that shoot and the guns don't shoot, that's a misrepresentation, and it's material. That's correct. And so the question about payment by the government in that particular context is less necessary because it is, to a reasonable person, material to the buyer and seller's relationship that they're buying something they know will meet its fundamental purpose. The mistake that the relator made was suggesting, as has been argued here today, that for Medicaid, a care plan is what the government wants. A care plan isn't what the government wants. Okay, we just flipped over the care plan. Let's start with Medicare before we— Medicare. Medicare, before we go to Medicaid. And let me ask the question this way. Why wouldn't it be exceedingly relevant and material for Medicare to know the minutes that were actually being declared for the therapy that was being performed? If you're billing them for 700 minutes of therapy and, in fact, only 350 were performed, what could be more material to the payor to know that it was really only 350 rather than 700? Well, it depends on the context of the Medicare claim. First, Medicare is a prospective payment system. The prospective payment system is established by an assessment period for the so-called RUG score. So as to ramping, the allegation is— Let's start with upcoding. We'll start with upcoding. We then go to the next principle of Medicare, which is that Medicare will only pay for that sometimes called medical necessity. The relator put on zero evidence of medical necessity. In fact, they made it very clear they were not challenging medical necessity. And when Ms. Bradley, their expert, who was a damages expert, spoke to inconsistencies and or deficiencies in the record, the judge asked, and she made clear she was not speaking to whether or not those would amount— Let me reduce my question to simple terms, at least for me. If Medicare is providing for 10 hours of physical therapy at $100 an hour, and in fact only five hours is provided, but you bill them for 10, wouldn't the bill that asserts 10 hours of physical therapy be material? Possibly. And what possible theory could it not be relevant and material? In my hypothetical. Understood, Your Honor. Well, first of all, if Medicare had set the RUG score, because it is prospective, so it isn't fee-for-service. Take my hypothetical. In your hypothetical, of course— My hypothetical is you bill Medicare for 10 hours of physical therapy, the guy had a bad knee, and in fact you only gave him five. But the bill said 10 hours, $100 an hour, $1,000. In fact, you were due in owing only $500 because you only gave him five hours. Wouldn't the bill itself that reflected 10 hours be most material, critical to the determination of how much money to pay? If it were paid on the basis as you describe, Your Honor, yes. But that's not how Medicare pays in this situation. Medicare doesn't pay by the unit of service. It pays by an estimate of services identified during the assessment period based on the amount of therapy given. The amount of therapy— Doesn't that go to the heart of what the dispute is, as far as Medicare goes,  as to whether or not the amount of care was accurately reported on the UB4, whatever the form is. And the reason I ask that is, actually, I tried to figure out how the jury arrived at its verdict by going back and looking at Dr. Panis' random sample and Nurse Bradley's spreadsheet, and then there's a piece missing, Mr. Vianello. There's very little in the record about Mr. Vianello's testimony. And I was trying to confirm my impression that the nature of the upcoding was more in the, like what Judge Marcus described, versus value judgments that were reflected in the billing, if you understand me. And I was not able to spend enough time with the record, really, to figure this out. Allow me to, what I hope will be, to distill that answer. The Medicare claims and their alleged falsity and materiality to the government payment decision are based on the two theories that Mr. Ho described here. One is so-called upcoding, which is sort of the generic relator's argument about you charge more than that for what you are entitled to based on services provided. The starting point for all Medicare claims is would the claim have been paid by the government, not whether or not they kept the records. And the case here is absolutely clear, and the record is absolutely clear, that medical necessity was not challenged. What that means is those claims qualified for payment. They did not fail their fundamental purpose. So to Judge Marcus's question, well, what about the volume of therapy provided? In some settings, that is how Medicare pays, but not here. Now, did they misrepresent care that was provided on the so-called upcoding claim, aside from ramping, based on this? So what the relator testified to was she saw ramp and upcoding, but it's very generalized. And the claims that she's describing here do show discrepancies at two facilities, based upon her observation of the number, essentially the qualification of the patient, but that level of therapy, and that the therapy was not provided as the condition suggested. That may or may not be material to the government's decision. But the uncontested testimony of Mr. Pelvis and Ms. Boesel is that they were audited constantly, and they are, by ZPICs, by Medicare auditors, by Medicaid surveyors, which is why the judge said, show me why, how they've been denied, based on these kind of discrepancies. A very important fact, and I'm sorry to go into this detail, but I think it's important to your understanding, given the vast record. The provision of services that was considered, and that Bradley assessed, Bradley assessed it to determine, were there discrepancies in the time charts? She had virtually nothing to say about how, or why, or further things, or corrections. In other words, the other elements of a false claim were not present. And they were all, however, attributed to 53 facilities, using no more than 300 claims. And there is no evidence that there was a, as the court noted, a top-down directive. So the causation element is based upon no more than budgets, a profit incentive, and an occurrence to put a patient in the highest category. And I'd like to transition to the Medicaid plan, because I know I've exhausted my time here, Your Honors. It's really important, I think, that we look at this treatment plan. Because that is probably the easiest to resolve. We know that the treatment plan could not have been material to the government's decision to pay. Not only was there no decision to pay. But wasn't there testimony in the case to the effect that, as far as the state of Florida was concerned, it would not pay one dime if the comprehensive plans were not submitted? And in fact, they were not submitted here. Well, no, actually, they were, Your Honor. They were surveyed. They saw the plans. In fact, the relator herself participated in the self-disclosure to the state that a treatment plan had not been secured adequately for this. And the uncontested testimony is that there was never a recoupment, a claim, that we won't pay. There is a condition of payment. Yes, it exists, just as it does on the Medicare side, that you need to have, on the Medicaid side, a treatment plan. But that's exactly what Escobar says. That's why I opened with, prior to 2016, these kinds of conditions of payment plans were critical. That was the theory. The Supreme Court said, no, no, not so fast. Merely showing that there is a condition of payment is relevant to, but not dispositive of, the issue. There needs to be something more. And when asked, well, what does the government do when it has the information that there is a treatment plan that's inadequate? And the response from the relator repeatedly was, well, we don't know what the government does. We just know what they say. So implication of the rules. The state of Florida says, violation of virtually any law anywhere constitutes grounds for not paying the claim. But they don't do that. And they don't do it for a very simple reason. They need to have care provided to these patients. Yes, they pay a lot of money for it. They have a lot of residents. You don't turn out the facility or the resident on the treatment plan where it's never been shown, in this evidence, that they would not have paid in practice. Whether or not the comprehensive plan was submitted was submitted timely. That's exactly right, Your Honor. Let me ask you just one final question. We've gone over our time. The district court's determination setting aside the verdict and the district court's determination granting the motion for a new trial turned on materiality and scienter. Those were the reasons and the only reasons. The district court never said, did it, never reached the conclusion, did it, that the methodology employed by PANAS to calculate damages was insufficient or in error, either because the sample of 300 Medicare resident days or 300 Medicaid resident days was too small or was otherwise improvidently drawn. That was not the reason or the reasons that were offered. Do I have that right? Partly, Your Honor. There are three considerations, I think, that the courts had. One is the court questioned the application of the damages methodology for the use of establishing damages and liability of the corporate defendants. So the application... I know there was a lot of discussion about it, but I'm talking about when I examine the district court, Judge Meredith's order, granting the relief that you sought to it, set aside the verdict or in the alternative, give us a new trial. The reasons given by the district court were materiality and scienter. Those were the failures and that's why he reached the conclusion that he did. Not because the sample was too small or wasn't properly drawn or anything like that. I do have that correct. That is correct. He did not... Nothing in the 23-page order that Judge Meredith entered on January the 11th, 2018, that said word one about the calculus of damages. I believe that the court said somewhere, Your Honor, that he questioned whether or not he had improvidently allowed the introduction of the evidence for its use as proof of damages. The court also did, however, expressly reserve on that point its reliance upon our brief. And we did call into question the manner in which 26 claims could have resulted in $30 million as damages as being not supported. It's not a matter of calculation of the jury's consideration. There's no evidence to support any such allocation of damages here. I've got it. Thank you very much. Thank you, Your Honor. Thank you, Your Honors, for the consideration. One comment that I make for you at the outset, Mr. Ho. In respect of what I had asked first, whether or not you had an objection to share the confidentiality with ours, seems to me to be of no moment given what your colleague has said. His argument does not dispute whether it's 4% or 40%. His argument simply is you can't sign away anything by way of recovery, even if you had control. So I don't know that that really is an issue any longer. But I leave it to you, if you, for some reason, want us to consider it, you will first have to decide whether you'll give it to them. Otherwise, we won't. Understood. Okay. Yes, Your Honor. Judge Markison, may I please the Court? If I may make two quick points about Medicare and then turn to Medicaid. The Medicare fraud— Let me ask again the final question I asked, Mr. Luce. Let me ask you. There's nothing in the district court order going to the methodology by which PAN has calculated damages, is there, that's before us now? Your Honor is correct. That was not the basis for the relief that the district court— Although he turns around and he says, but there's sort of this enigmatic pregnant open line from the district court and for the other reasons asserted by the appellee. And he argues specifically something about the calculus of damages, at least before the district court when he said, set aside the verdict or give me a new trial. So two responses to that, Your Honor. First, again, I think it's sort of emblematic of the district court's failure to heed the federal rules of civil procedure. There was a very, very limited motion in the first instance for a new trial. It related only to an alleged inconsistency between the damages awarded pursuant to the Medicaid piece of the case and the number of false claims. And as we say in our brief, that inconsistency argument was waived because it was not first made before the jury was discharged. The argument didn't go to the Medicare calculus. I'm sorry? No, it did not go to the Medicare part of the case. The Medicare portion I'm talking about. That's correct. There was no request for a new trial based on Medicare other than a very concurrent— Our concurrentity and scienter were the only reasons for setting aside the verdict as to the Medicare recovery. Right. I'm sorry, Your Honor. I think we may be conflating the JMLL issue and the new trial issue. Take them one by one. Yes, Your Honor. With respect to JMLL, as Your Honor knows, the law is you have to make a motion prior to the verdict under Rule 59, and you can only renew that motion after, under Rule 59—under Rule 50B. With respect to that, there was no argument made pre-verdict with respect to the materiality of the Medicare fraud or with respect to knowledge, and yet the district court granted JMLL on materiality with respect to Medicare and with respect to knowledge. That was procedurally an error even before you get to the question of whether the district court properly applied the standard under Rule 50 to construe the evidence in the light most favorable to the verdict. Then there's a separate issue of the new trial motion. So the new trial motion, which is in the record, was limited really in stripping out the conclusory arguments. The new trial motion was limited to one point, and that was that there was $30 million in false claims, and the defendant said, how could this be? This is inconsistent. Well, that was not properly preserved because that argument should have been made before the jury was discharged, and that way we could have gone back to the jury and said, well, which is it? Is it $30 million or 26 false claims? Because that seems somewhat inconsistent. They waived that. Then the district court, on its own motion, granted a new trial on other grounds, including all the grounds that we've talked about today, materiality, et cetera. That was a violation of Rule 59B because under Rule 59B, the district court was not entitled to sua sponte, grant a new trial, after 28 days. So again, procedurally, we have some real problems with respect to— I understand, but let's go to the merits. With respect to Medicare, to Your Honor's hypothetical about the physical therapy, this is actually worse than your hypothetical because of what Mr. Luce alluded to when he was at the podium. It's not just that the provider gets paid for 10 hours when he only provided five for that actual day of services. Because of the prospective nature of the Medicare payment system, the provider will get paid for 10 hours for the rest of the month based on a misrepresentation about what was actually provided in that assessment period. So when I went back and looked at Nurse Bradley's spreadsheet— Yes, Your Honor. First of all, I had trouble identifying the particular patients that she was saying there was either ramping or upcoding for. But on top of that, her notes would reflect something like, well, there isn't documentation to support the number of therapy minutes. So are we talking about—I think one of the problems here is that on the one hand, it almost sounds like, well, we're just talking about missing documentation, kind of like the missing care plans, versus deliberate upcoding because of the way her notes read in the spreadsheets. So can you expand on that a little bit? I'd be happy to address that. Yes, Your Honor. What she did is she looked at the number of minutes that was reported in the RUG code. So let's say it was RU. So that's a representation, as Your Honor alluded to before, that 720 minutes have been provided. She found the actual physical therapy logs for that patient for that period, and she looked and she said how many minutes were actually provided based on the nurse's notes. Well, how many minutes are reflected in the logs? Absolutely, based on the nurse's notes. There's a regulatory obligation on the part of these facilities— Before you get to the regulatory obligation, just finish the thought. Yes. So the claim was 720 minutes. She looked to see what, in fact, was provided and concluded that 720 minutes was not provided. That's right. And Your Honor is absolutely right. The defendants got up in front of the jury and said, well, it's not that these minutes weren't provided. It's just that they're not in the notes. Well, the response to that is there is a regulatory obligation to keep accurate documentation of the number of minutes that's actually provided. There was no evidence put on by the defendants from, say, the nurses that provided the care that, yes, in fact, I provided 720 minutes, but I just forgot to write it down. And there was a plethora of evidence, as we've put in our brief, that there was this top down rug quota practice on the part of the management company to require, upon threat of termination of these nurses, that they meet these rug quotas, irrespective of what the patient actually needed. And so the jury, quite reasonably, came to the conclusion this is not just people forgot to write down the number of minutes in all of these therapy logs. This was, in fact, an upcoding, you know, reporting more minutes than were actually provided. And it has nothing to do, to your Honor's earlier question about value judgments about whether therapy should have been provided or was necessary. If it was on the log, Judge Bradley credited it. She made no effort to say that there was therapy that was provided that was not reasonably necessary. So when we examine the spreadsheets in detail, we will discover, A, the numerator 720 minutes billed, B, in fact, only 340 minutes actually performed. That is the core of her report and her testimony. I think her testimony is in volume four of the appendix at roughly page 650 or thereabouts. And we quote from it fairly liberally at our brief at pages 9 through 12. Well, actually, just so that it's understood, she doesn't actually quantify the missing minutes, right? It's Mr. Vianello, I guess, who does that. And then Dr. Panis does his extrapolation. No, she does quantify the missing minutes. But Dr. Vianello translates that into the difference in the number of dollars that Medicare would have paid for if they had known the truth versus what they actually paid. So I just want to make sure I understand the process as it existed as you put it on at the trial. She made an examination of some of them and concluded in multiple instances that bills were submitted for work not performed. Correct, Your Honor. Vianello turned that into a dollar amount. Yes, Your Honor. And Panis then extrapolated from 300 resident days to a million and a half resident days. Correct. Okay. With respect to the care plans, I think the most succinct way to understand it is that the quid pro quo, to use a phrase that's in common parlance nowadays, was that Medicaid would pay a flat fee for all the care that the patient needed. And that's the critical part. The care plan is the document by which Medicaid knows what it was entitled to and what the patient needed. If there's no care plan, Medicaid doesn't know what it's paying for because nobody has bothered to figure out in the kind of rigorous way that Medicaid demands what this patient actually needs. And so that's why it is central to the bargain. That's why the Inspector General says that it's important. And that's why all these witnesses testified at trial, including defendant's own witnesses, that if you don't have the care plan, you're not going to get paid. You don't get paid. Can I just get a clarification about something in the record? So I think there was testimony that the MDS, the Medicare data sets, were electronically sent to CMS or whoever they go to. But copies were not necessarily in the patient files. But I wasn't sure about the care plans. Was there also evidence that the care plans had been submitted, but for some reason there were not hard copies in the patient files? I don't recall evidence to that effect, Your Honor. Standing here right now, though, I confess I don't recall anything to that effect. I had a hard time keeping the acronyms straight. There are a lot of forms involved in this case. And to the questions about whether there is evidence of post hoc regulatory enforcement, there's not for one important reason, which is that we tried to get in evidence post-2012. And the district court ruled that all evidence post-2012 was irrelevant and so wouldn't let any of that evidence in. We don't think, and I think the government supports us in this regard, that that evidence is necessary because, again, there was direct testimony at trial that if you don't have these care plans, payment will automatically be denied in the words of Ms. Lowry Morris, which was one of our witnesses. And I'll just quote again from Dr. Pelovitz, which was a defense witness who was a former CMS official. When you were in charge of surveys at CMS, MDS and care plans did need to be in place for payment. Isn't that right? Answer, yes. That's at 731 of the appendix. So it really, you know, there was direct evidence of the kind that Escobar is talking about that not just a theoretical condition of payment, but in actual practice, if you didn't have this core document that is the foundation of what the government is bargaining for under Medicaid, you don't get paid. Thank you much. One final observation. If you want us to consider that which you submitted to us in camera and ex parte, you will have to tell us that in five days and agree to make that available to Mr. Luce. Otherwise, we will not consider it. We'll advise the court one way or the other within five days. Thank you. Thank you, counsel. Thank you for the court's time. We will be in recess until 9 a.m. tomorrow morning.